O

JS - 6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MATTHEW WILSON<br><br>                    Plaintiff,<br><br>vs.<br><br>SOLOMON ENTITIES DEFINED<br>BENEFIT PENSION PLAN, an ERISA<br>plan; KENNETH A. SOLOMON,<br><br>                    Defendants.<br>_____<br><br>CHARAN MELLOR<br><br>                    Plaintiff,<br><br>vs.<br><br>SOLOMON ENTITIES DEFINED<br>BENEFIT PENSION PLAN, an ERISA<br>plan; KENNETH A. SOLOMON,<br><br>                    Defendants.<br>_____ | Case No. CV 12-1379 CAS (JEMx)<br>Case No. CV 12-1380 CAS (JEMx)<br><br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

I.    **INTRODUCTION**

On February 17, 2012, plaintiffs Charan Mellor and Matthew Wilson filed their

respective suits against defendants Solomon Entities Defined Benefit Pension Plan,

Kenneth A. Solomon ("Solomon defendants"), and Does 1–10, inclusive.  Plaintiffs'

claims arise out of the allegedly improper payment of pension benefits in accordance with the terms of an ERISA-governed plan.  On April 13, 2012, defendants filed a third-party complaint against third-party defendant Liden, Nestle, Soled & Associates, Inc ("Liden"), seeking indemnification for any damages owed to plaintiffs.

On April 5, 2013, the Court held a consolidated bench trial at which all parties appeared.  After considering the parties' arguments, the Court finds and concludes as follows.

## II.   FINDINGS OF FACT

### A.   The Parties and the Plan

1.   To the extent necessary, each of these findings of fact may be deemed to be a conclusion of law.

2.   Plaintiffs Charan Mellor and Matthew Wilson are former employees of The Laboratory of Risk & Safety Analyses, Inc. ("the employer"), which is owned and operated by defendant Kenneth A. Solomon.  The employer and Solomon established the Solomon Entities Defined Benefit Pension Plan and Trust ("the Plan") in February 1998 for the benefit of the employer's employees (17).[1]

3.   Liden, Nestle, Soled & Associates ("Liden") administers the Plan on Solomon's behalf.  In particular, Judy Soled, an owner of Liden, handled the administration of the Plan.

4.   The Plan was amended and restated in its entirety effective February 1, 2002 ("2002 Plan") (17).

5.   Section 1.1 of the Plan defines "accrued benefit" as, inter alia, "the retirement benefit a Participant is entitled to receive pursuant to the retirement benefit formula set forth in Section 5.1 . . . ." (22).

6.   Section 1.3 of the February 2002 Plan defined "actuarial equivalent" as:

[A] form of benefit differing in time, period, or manner of payment from a

---

[1] All page references refer to the relevant page in the administrative record.

specific benefit provided under the Plan but having the same value when computed using Pre-Retirement Table: None; Post-Retirement Table: GATT and Pre-Retirement Interest: 6%; Post-Retirement Interest: 6%. Notwithstanding the foregoing, the mortality table and the interest rate for the purposes of determining an Actuarial Equivalent amount . . . shall be the mortality table and the interest rates specified above or the "Applicable Mortality Table" and the "Applicable Interest Rate" described below, whichever produces the greater benefit (23)

7.    The "Applicable Mortality Table" in the 2002 Plan was defined as "the table prescribed by the Secretary of the Treasury.  Such table shall be based on the prevailing commissioner's standard table (described in Code Section 807(d)(5)(A)) used to determine reserves for group annuity contracts issued on the date as of which present value is being determined. . . ." (23–24).

8.    The "Applicable Interest Rate" was defined in the 2002 Plan as:

[T]he annual rate of interest on 30-year Treasury securities determined as of the first day of the Plan Year during which the Annuity Starting Date occurs.  However, except as provided in Regulations, if a Plan amendment (including this amendment and restatement) changes the time for determining the "Applicable Interest Rate" (including an indirect change as a result of a change in the Plan Year), any distribution for which the Annuity Starting Date occurs in the one-year period commencing at the time the Plan amendment is effective (if the amendment is effective on or after the adoption date) must use the interest rate as provided under the terms of the Plan after the effective date of the amendment. . . .If the Plan amendment is adopted retroactively (that is, the amendment is effective prior ti the adoption date), the Plan must use the interest rate determination date resulting in the larger distribution for the period beginning with the

3

effective date and ending one year after the adoption date.

(24).  This rate is referred to as the "30-year Treasury Bill rate."

9.      Section 1.3 concludes by stating that:

In the event that this Section is amended, the Actuarial Equivalent of a Participant's Accrued Benefit on or after the date of change shall be determined (unless otherwise permitted by law or Regulation) as the greater of (1) the Actuarial Equivalent of the Accrued Benefit as of the date of change computed on the old basis, or (2) the Actuarial Equivalent of the total Accrued Benefit computed on the new basis.  (Id.)

10.     Liden, in its role as third-party administrator of the Plan, suggested and drafted a written amendment to section 1.3 of the Plan.  Solomon signed the amendment into effect on December 4, 2009 ("2009 Amendment").

11.      The 2009 Amendment was adopted as a response to the enactment of the Pension Protection act of 2006 ("PPA"), P.L. 109-280, 120 Stat. 1063, which authorized defined benefit plans to modify their actuarial assumptions and permits the use of "segmented rates" in place of the 30-year Treasury Bill rate, (codified at 29 U.S.C. 1055(g)(3)).  (171).  It is undisputed that the Amendment conforms with the terms of the PPA.

12.     This amendment did not restate the amended plan terms.  See id. at 1 ("Article I, Section 1.3 shall be amended to add the following. . . .").  This Amendment was made retroactive "to Annuity Starting Dates that occur during or after the first Plan Year that begins in 2008. . . ."  (Id.).  Each plan year begins on February 1 and runs until January 31 of the following year.

13.     Paragraph two of the 2009 Amendment states:

The assumptions contained in this Paragraph 1.3 shall be used for purposes of top-heavy minimum benefits under Paragraph 5.2 of Article 5, if applicable, to determine whether the benefits offered require consent under

4

Paragraph 5.7 of Article 5 by using the Applicable Mortality Table and the Applicable Interest Rate as defined herein.

14.     The 2009 Amendment defines "Applicable Mortality Table" as "a static mortality table, modified as appropriate by the Secretary, based on the mortality table specified for the Plan Year under Section 430(h)(3)(A) of the Code (without regard to Section 430(h)(3)(C) or (D) of the Code).  For distributions with Annuity Starting Dates occurrring during the Stability Periods beginning in year 2009 through 2011, the "Applicable Mortality Table" means the column labeled 'UNISEX' in the appendix to IRS Notice 2008-85."

15.     The Amendment defines "Applicable Interest Rate" as "the adjusted first, second, and third segmented rates applied under rules similar to the rules of Section 430(h)(2)(C) of the Code for the month before the date of the distribution or such other time as the Secretary may by regulations prescribe.  For each segment rate period, as described below, the Applicable Interest Rate shall equal the average yields of the segment rates described under Section 430(h)(2)(D)(ii) of the Code."  (1).  These are the "segmented rates."

16.     The Amendment provides that other than the foregoing additions or changes, "[a]ll other terms and conditions remain the same.  All benefits accrued to the Participant on or after such adoption date of this amendment shall not be less than those benefits accrued prior to such adoption date."  (3).

17.     In late 2009, both plaintiffs' employment was terminated and plaintiffs elected to each receive their accrued benefits under the Plan in the form of a lump-sum payment.  Liden calculated the lump-sum benefit owed to each plaintiff, or the actuarial equivalent of each plaintiff's accrued benefit, using the segmented rates provided for in the 2009 Amendment. (124–126).  Each plaintiff was paid this lump sum amount.

18.     On July 10, 2010, plaintiffs, through their attorney, wrote to defendants and notified them of their claim for additional benefits.  Plaintiffs contended that the 2009

Amendment added a subparagraph 2 to section 1.3, which was applicable for the purpose of top-heavy minimum benefits calculations under section 5.2, but that the Amendment did not purport to change the preexisting language in section 1.3 that required the use of 30-Year Treasury Bill Rates as the "Applicable Interest Rate" under the Plan. (210–211).

19.   Defendants responded on August 6, 2010, that the benefits of each plaintiff had been properly paid under the terms of the amended plan.  Defendants' letter did not cite any particular plan provisions, but instead argued that the "administrator's calculation of benefit payments was not 'extraordinary imprudent or extremely unreasonable,' but rather a reasonable interpretation of the Plan and reasonable selection of interest rate."  (208)

20.   Plaintiffs responded to defendants' letter on October 5, 2010, again raising their contention that the amended Plan preserved "[t]he pre-existing actuarial factors" for calculating the accrued benefits of the Plan's beneficiaries.  Plaintiffs also sought clarification as to defendants' interpretation of the Plan that allowed for the use of segmented rates rather than the 30-Year Treasury Bill Rate.  In addition, plaintiffs argued that the Plan provides for "the preservation of a participant's pre-amendment accrued benefits," even if the segmented rates would otherwise apply.  (206–207)

21.   On December 9, 2010, and January 12, 2011, counsel for defendants responded that defendants had a number of counter-claims that they could assert against plaintiffs arising out of plaintiffs' employment and sought to discuss a potential settlement of all parties' claims.  (202–204).  On January 26, 2011, plaintiffs responded by again seeking to determine defendants' basis for using the segmented rates contained in the 2009 Amendment, and declining defendants' offer to settle this matter. (199–200).[2]

───────────────

[2] Although the December 9, 2010 communication in particular was labeled as

continue...

22.     On April 29, 2011, defendants reiterated their offer to settle all pending disputes between the parties.  (198).  Plaintiffs did not respond to this communication.

23.     On May 23, 2011, plaintiffs each filed suit against defendants in this Court. See Matthew Wilson v. Solomon Entities Defined Benefit Pension Plan, et al., No. CV 11-4397 and Charan Mellor v. Solomon Entities Defined Benefit Pension Plan, et al., No. CV 11-4396.

24.     On September 26, 2011, the Court granted defendants' motions to dismiss in both cases.  No. CV 11-4397, Dkt. No. 19; No. CV 11-4396, Dkt. No. 18.  The Court's conclusions were two-fold.  First, the Court found that plaintiffs had failed to exhaust their administrative remedies, as neither plaintiff filed a written request for a hearing per the mandate of section 2.8 of the Plan.  Second, the Court concluded that plaintiffs had not adequately alleged that a futility exception to the exhaustion requirement should apply.  Without even attempting to initiate the administrative process, the Court found that neither plaintiff could claim that doing so would be futile, even in the face of defendants' stated intentions to deny their claims.  The Court's dismissal of each case was without prejudice.

25.     On November 1, 2011, plaintiffs formally requested a hearing pursuant to section 2.8 of the Plan.  (187).  On November 29, 2011, defendants responded with a description of plaintiffs' benefits calculations, provided by Judy Soled of Liden. Thereafter, an administrative hearing was held on December 15, 2011.  (169–173).

26.     After holding an administrative hearing, Dr. Solomon, the Plan Administrator, again denied the plaintiffs' claims for benefits.  First, the Administrator concluded that each plaintiff had not complied with section 2.7 of the Plan, which

---

[2]...continue
"privileged settlement discussions" by defendants, these communications were made part of the administrative record in this case and defendants have not objected to their consideration here.

requires a proper claim to be submitted in a timely fashion.  Second, the Administrator found that plaintiffs' claims should be denied for the reasons set forth in Liden's previous communications that had been provided to plaintiffs.  (160–164).  As stated therein,

> [p]rior to the Plan being amended, calculations were made using the 30-year Treasury rates.  Per Rev. Ruling 2007-48, amending the plan to change from the 20 year Treasury rates to [IRC] 417(e) rates will not violate 411(d)(6) of the [IRC] Code, even if that reduces the amount of distribution with a payout date occurring during a plan year beginning in 2008 or in a subsequent year.

(162).  Accordingly, the Administrator denied plaintiffs' claims.

## III.   CONCLUSIONS OF LAW

27.   To the extent necessary, each of these conclusions of law may be deemed to be a finding of fact.

### A.   Standard of Review

28.   Where an ERISA plan grants an administrator discretionary authority to determine a claimant's eligibility for benefits, courts review a denial of benefits for abuse of discretion.  Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 111, 115 (1989).  Under this deferential standard, a plan administrator's decision should be upheld if it is reasonable, but overruled if it is illogical, implausible, or unsupported by inferences that can be drawn by facts in the record.  Stephan v. Unum Life Ins. Co. of America, 697 F.3d 917, 929 (9th Cir. 2012).

29.   However, the nature of this abuse of discretion review changes slightly when the plan administrator has a structural conflict of interest due to the fact that it both pays benefits under a plan and determines whether a claimant is eligible for benefits. Firestone Tire, 489 U.S. at 115.

30.   In MetLife v. Glenn, 554 U.S. 105 (2008), the Supreme Court explained that the existence of a conflict of interest should be "weighed as a factor in determining

whether there is an abuse of discretion," and that the significance of a conflict of interest varies from case to case. MetLife, 554 U.S. at 115, 117.

31.     Applying MetLife, the Ninth Circuit explained that if the facts and circumstances in a particular case indicate that a conflict of interest may have "tainted the entire administrative decisionmaking process," then a reviewing court should review the articulated basis for a denial of benefits with "enhanced skepticism." Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 631 (9th Cir. 2009) (following Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969 (9th Cir. 2006) (en banc)).  See also Burke v. Pitney Bowes Inc. Long-Term Disability Plan, 544 F.3d 1016, 1025 (9th Cir. 2008) (discussing consideration of conflicts of interest in abuse of discretion review).

32.     Here, section 2.3 of the Plan expressly provides that "[t]he Administrator shall administer the Plan in accordance with its terms and shall have the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan."  (35–36). Because Dr. Solomon, the Plan Administrator, made the final decision to deny benefits, the Court finds that an abuse of discretion standard applies. See Abatie, 458 F.3d at 963 (holding that plan wording "granting the power to interpret plan terms and to make final benefits determinations—confers discretion on the plan administrator," and therefore an abuse of discretion standard applies).

33.     Even if Solomon relied on Liden to perform the benefits calculation initially, Solomon, as the Plan Administrator, made the ultimate denial of benefits.  This case is unlike those cases where an administrator has engaged "in wholesale and flagrant violations of the procedural requirements of ERISA," which would justify de novo review.  Abatie, 458 F.3d at 971–72.  Here, Solomon has exercised his discretion, even if he made procedural errors in the process of doing so by failing to apprise plaintiffs of the grounds for his decision initially.  Accordingly, an abuse of discretion standard is appropriate.  See Burke, 544 F.3d at 1024.

34.     Although abuse of discretion review is the appropriate standard, the Court finds that a structural conflict of interest developed between the Plan Administrator and his former employees.  The Supreme Court has indicated that employer funded and administered plans, like the one at issue here, present a greater structural conflict than insurer administered and funded plans.  See id. at 1027 (citing MetLife, 128 S. Ct. at 2348–50).  This conflict became more pronounced when plaintiffs, as former employees, attempted to assert their rights to additional benefits under the Plan, as defendants demanded that plaintiffs agree to release their claims and pay defendants' attorneys' fees that had been incurred to date.  (198–204).  Accordingly, the Court concludes that a structural conflict of interest exists that must be taken into account in determining whether the Plan has abused its discretion in denying plaintiffs' claims for additional benefits.  Id.

35.     As with the structural conflict of interest noted above, "[a] procedural irregularity . . . is a matter to be weighed in deciding whether an administrator's decision was an abuse of discretion."  Abatie, 458 F.3d at 972.  The Court must weigh "all the facts and circumstances" in determining whether an administrator abused his or her discretion in interpreting the plan.  Id. at 968.

**B.     Evidentiary Issues**

36.     "[I]n general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review."  Abatie, 458 F.3d at 970.  Even on abuse of discretion review, the Court may, in its discretion, "consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest."  However, the Court's decision on the merits "must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise."  Id.

/ / /

37.     In addition to the foregoing, "[w]hen a plan administrator has failed to follow a procedural requirement of ERISA, the court may have to consider evidence outside the administrative record." Id. at 972–73.  In particular, a court may receive evidence "when the irregularities have prevented full development of the administrative record," such that the court is recreating the administrative record as it would have appeared in the absence of such irregularities.  Id. at 973.

38.     Here, the Plan Administrator initially failed to provide either plaintiff with an adequate statement as to why their requests for additional benefits would not be allowed.  See Plan Section 2.7.  Defendants initially relied solely on their "discretionary authority" to interpret the terms of the Plan.  (28).  However, after plaintiffs filed a formal request for an administrative hearing pursuant to 29 U.S.C. § 1133(2) and section 2.8 of the Plan, defendants provided plaintiffs with a description of their benefits calculations on November 29, 2011.  (122–126).  As discussed above, this letter noted that the "[26 U.S.C. §] 417(e) rates" were used, rather than the 30-Year Treasury Bill rates, pursuant to the 2009 Amendment to the Plan.  (124).  This resulted in a lower lump sum payment to each plaintiff.

39.     After the hearing, at which no new evidence was presented, the Administrator again denied plaintiffs' claims for the same reasons articulated previously.  (160–164).

40.     First, the Court finds that it need not consider the deposition testimony of Judy Soled to the extent it does not pertain to the existence or extent of a conflict of interest.  While her testimony explains evidence contained in the administrative record, including the reasons for using the particular interest rates that she did in calculating plaintiffs' lump sum benefits, the administrative record largely speaks for itself. Relevant to the existence of a conflict, Soled's testimony demonstrates that Liden performed the initial benefits calculation under the Plan, without any involvement or influence from defendants.  Soled Depo. 30:13–15.  In addition, defendants have never

asked Soled or Liden to reduce a benefits calculation or attempted to alter the calculation of a Plan participant's benefits. <u>Id.</u> at 30:17–32:3.

41.     Second, in their Opposition to Defendants' Opening Brief, plaintiffs seek to introduce the declaration of Kieran Ching, who testifies that he received a lump sum benefit under the plan on January 31, 2009, before either plaintiff Mellor or Wilson did. Pursuant to section 1107(b)(2)(A) of the PPA, plaintiffs contend that this evidence is relevant in determining the merits of their claims. Under this section, in order for a plan amendment adopted pursuant to the PPA to be made retroactive in application, the plan must be "operated as if such plan or contract amendment were in effect" during the period in which the amendment purports to have retroactive effect.[3] <u>Id.</u> In plaintiffs' view, the proffered evidence demonstrates that contrary to defendants' contentions, the Plan was not operated as if the 2009 Amendment was applied retroactively beginning in the February 1, 2008 plan year. Defendants object to plaintiffs' introduction of this declaration, contending that only evidence that relates to the existence or the extent of a conflict of interest may be introduced if it lies outside of the administrative record.

42.     The Court concludes that this evidence is not properly before the Court—it is outside of the administrative record, does not pertain to the conflict of interest identified previously, and could have been brought to defendants' attention and presented at the administrative hearing. <u>See Abatie,</u> 458 F.3d at 970–73. Before defendants conducted an administrative hearing, plaintiffs were notified that both plaintiffs' benefits had been calculated using the segmented rates set forth in 26 U.S.C. § 417(e), rather than the 30-Year Treasury Rates. Plaintiffs' contention all along has been that defendants should have used the 30-Year Treasury Bill Rates, rather than the

---

[3] While such an amendment would normally violate 29 U.S.C. § 1054(g), the "anti-cutback" provision of ERISA, the PPA expressly authorizes plan sponsors to make such a change retroactive. <u>See</u> <u>Dennison v. MONY Life Ret. Income Sec. Plan for Employees,</u> 710 F.3d 741, 743 (7th Cir. 2013).

segmented interest rates set forth in the 2009 Amendment.  Therefore, plaintiffs were clearly on notice of the dispute with respect to which rates would be applied, but failed to raise their argument with respect to section 1107(b)(2)(A) of the PPA and proffer the evidence in support of this argument before their opposition trial brief in this case.  In light of this chronology, plaintiffs offer no reason why they failed to present this evidence at the administrative hearing when plaintiffs had the opportunity to do so.

43.   This case is unlike <u>Burke</u> or <u>Abatie</u>, where the administrator articulated an entirely new ground for denying a claim for benefits after a hearing that was not part of the initial decision.  <u>See</u> <u>Burke</u>, 544 F.3d at 1028 (finding that the court may consider evidence where the claimant "had no reason to submit evidence into the administrative record regarding the timeliness of her claim, as she was not made aware that the Committee was considering that as a basis for terminating her benefits on appeal").  Plaintiffs here were on notice of the grounds for defendants' decision and had the opportunity to present their argument in the administrative appeal, and they may not raise a wholly new argument based on new evidence in this Court in support of their claim.  Accordingly, the Court sustains defendants' objection to the declaration of Kieran Ching.  This evidence is not properly before the Court.[4]

### C.   Interpretation of the Plan and 2009 Amendment

44.   Plaintiffs' first contention is that the 2009 Amendment prohibits the use of the section 417(e) segmented rates in calculating the actuarial equivalent of their accrued benefit.  Plaintiff notes the following language in the Amendment: "All other terms and

---

[4] Defendants initially objected to the introduction of this evidence before trial.  The Court withheld ruling on defendants' objection and heard additional testimony from Jody Soled during trial regarding the benefits calculation of Kieran Ching.  Having considered defendants' objection and concluding that it should be sustained, the Court disregards the testimony of Soled offered at trial.  The Court also declines to consider the impeachment evidence offered by plaintiffs post-trial, as well as defendants' responses.  Third-party's ex parte application to present additional testimony from Soled is denied as moot.

conditions remain the same.  All benefits accrued to the Participant on or after such adoption date of this Amendment shall not be less than those accrued prior to such adoption date."  (3).  In plaintiff's view, the use of the segmented rates resulted in a reduction of his accrued benefit, and therefore, the 30-Year Treasury Bill rate provided for in the original plan document should have been used.

45.    The Court finds that this argument is without merit.  Plaintiff is correct that the term "benefits accrued" does not appear to be a defined term under the Plan, but "Accrued Benefit" *is* a defined term under the Plan.  Because the "benefits accrued" would be commensurate with a participant's "Accrued Benefit," the Court finds that the definition of "Accrued Benefit" contained in the plan is informative.  As defined in section 1.1 of the Plan, an "Accrued Benefit" is:

> the retirement benefit a Participant is entitled to receive pursuant to the retirement benefit formula set forth in Section 5.1.  In the event a Participant terminates employment prior to Normal Retirement Date, the Participant's Accrued Benefit shall be equal to the amount determined under the retirement benefit formula computed as of the Participant's date of termination of employment.

(22).  Section 1.3, in turn, defines the "Actuarial Equivalent" of an "Accrued Benefit" under the plan for purposes of calculating the retirement benefit of a participant who terminates their employment prior to the Normal Retirement Date .  These definitions also comport with the understanding of these terms under ERISA.  See United States v. Novak, 476 F.3d 1041, 1061 (9th Cir. 2007) (defining an "accrued benefit" as "a right to the annual payments promised by the terms of the plan," or alternatively, if received in the form of "a lump sum payment . . . to their actuarial equivalent.").

Therefore, nothing in the Plan or the 2009 Amendment prohibits a reduction of the lump sum "actuarial equivalent" of plaintiffs' accrued benefit, as opposed to a reduction in the value of the accrued benefit itself.  The lump sum payment is by its very nature an approximation of the total accrued benefit that would likely be paid, or the summation of

the "annual benefit commencing at normal retirement age," discounted to its present value. 29 U.S.C. § 1002(23); see Steiner Corp. Retirement Plan v. Johnson & Higgins of Calif., 31 F.3d 935, 939 (10th Cir. 1994) ("It is without a doubt that the lump sum is not an accrued benefit as that term is defined in 29 U.S.C. § 1002(23)").

Accordingly, the Court finds that defendants could not have, and did not, reduce either plaintiffs' accrued benefits by utilizing the section 417(e) segmented rates, rather than the 30-Year Treasury Bill rates, when calculating the actuarial equivalent of plaintiffs' accrued benefits. While this calculation resulted in a reduction in the actuarial equivalent of plaintiffs' accrued benefits, this was allowable under ERISA and the plain terms of the plan as amended.

46.     Plaintiffs' second argument is that 2009 Amendment *only* supplies the Applicable Interest Rate for determining whether the benefits offered require consent under section 5.2 of Article 5 for purposes of top-heavy minimum benefits. In plaintiffs' view, the 2009 Amendment amends section 1.3 to "add" a paragraph 2, but nothing in the Amendment purports to modify or remove the 30-Year Treasury Bill Rate that was already contained within section 1.3 for use in calculating the actuarial equivalent of an accrued benefit. Therefore, plaintiffs maintain that defendants' use of the segmented rates provided for in the 2009 Amendment was an unreasonable interpretation of the plan.

47.     Defendants concede that section 1.3, as amended, is ambiguous. In light of this ambiguity, defendants argue that the Court should defer to the Administrator's reasonable interpretation of the Plan under an abuse of discretion review. In defendants' view, the rates in the 2009 Amendment clearly apply to the calculation of the lump sum, as it would make no sense to have two sets of rates in section 1.3 of the Plan as amended. This is particularly true, defendants argue, since the PPA expressly permitted defendants to adopt these segmented rates for use in calculating the actuarial equivalent of plaintiffs' accrued benefits. This Amendment was adopted to take advantage of the

provisions of the PPA, and therefore defendants contend that their interpretation of the Plan—that the 30-Year Treasury Bill Rate is no longer applicable—is at least not implausible under arbitrary and capricious review.

      48.    The Court concludes that defendants did not abuse their discretion in interpreting the Plan and denying plaintiffs' claims for additional benefits. Given the tremendous ambiguity in the amended section 1.3, defendants' interpretation of the plan language is not unreasonable. The 2009 Amendment provides that "[t]he assumptions contained in this section 1.3 shall be used for the purposes of top-heavy minimum benefits under Paragraph 5.2 of Article 5, if applicable," which implies that there will only be one set of "assumptions"—including only one "Applicable Interest Rate—in the amended section 1.3. Particularly in light of the PPA, it would be highly illogical for the Plan to contain *two* sets of "Applicable Interest Rates" in section 1.3, one for use in calculating the "Actuarial Equivalent" of a participant's accrued benefit, and another for use in section 5.2. In addition, although the PPA does not mandate the use of IRC Section 417(e) rates, the 2009 Amendment was clearly adopted in order to take advantage of the higher discount rates provided therein.

      Greater force to this conclusion is provided by the pre-amendment section 1.3, which states that "the mortality table and the interest rate for the purposes of determining an Actuarial Equivalent amount . . . shall be the 'Applicable Mortality Table' and the 'Applicable Interest Rate' described below . . . ." (23). If plaintiffs were correct in that the 2009 Amendment added an additional mortality table and interest rate to section 1.3, it would be entirely unclear which table and rate should be used in calculating the actuarial equivalent of plaintiffs' accrued benefits.

      For all of these reasons, defendants' interpretation of the amended plan—that the 30-Year Treasury Bill Rate was eliminated in favor of the segmented rates of section 417(e)—is reasonable. Accordingly, the Court concludes that defendants did not abuse their discretion in interpreting the ambiguous language in the amended plan, even if a

conflict of interest existed at the time the denial of benefits was made.  Defendants' interpretation is reasonable in light of the ostensible purposes of the 2009 Amendment and the language of the Amendment and the Plan.

**V.      CONCLUSION**

        Based on the above Findings of Fact and Conclusions of Law, the Court finds that defendants did not abuse their discretion in denying plaintiffs' request for additional benefits under the Plan.  Defendants may make a motion for attorneys' fees and costs.

        IT IS SO ORDERED.


Dated: May 3, 2013

                                    _Christine a. Snyder_
                                    CHRISTINA A.  SNYDER
                                    United States District Judge